STATE of Minnesota, Respondent,

v.

James Michael ROEHL, Appellant.

No. C9–86–1855.

Court of Appeals of Minnesota.

July 14, 1987.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Sp. Asst. Atty. Gen., St. Paul, Stephen C. Rathke, Crow Wing Co. Atty., Brainerd, for respondent.

John R. Wylde, Jr., Minneapolis, for appellant.

Heard, considered and decided by LANSING, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

LANSING, Judge.

James Roehl appeals his conviction of burglary in the third degree. We affirm.

## FACTS

The Body Shop Fitness Center in Pequot Lakes, Minnesota, was broken into on the

night of April 10, 1986. An employee working after hours encountered a man, later identified as James Roehl, inside the building and called the police. Roehl was subsequently convicted by a jury of burglary in the third degree.

The Body Shop Fitness Center is a health club facility with a swimming pool, weight room, aerobics room, tanning room and sauna. There are vending machines for patrons in the reception area. The club is open until 9:00 p.m. and the employee on duty at closing is responsible for locking the premises, cleaning and counting receipts.

On the night of April 10, Christine Tulenchik let the last customer out of the building at approximately 9:00 p.m. She locked the door behind him and began her cleaning duties. While cleaning the restrooms, she heard a loud banging noise which seemed to come from the entrance. She looked down the hallway toward the front door, but did not notice anything unusual and resumed cleaning.

As she moved into the aerobics room, which has one wall completely covered with mirrors, Tulenchik noticed the reflection of a man standing behind a door across the room. She could not see him directly. Startled, she asked what he was doing there and the man moved partially out of her view, but toward her. Tulenchik ran to the front door. Although she had locked the door earlier, it was now unlocked and she could just pull it open. She ran to her car, which was parked next to the front door. While backing out and still facing the building, she saw the man run out the door and down the street. She drove to a nearby grocery store and called the police.

Police met Tulenchik at the Body Shop and confirmed the front door had been broken open. Tulenchik described the intruder as a male, approximately 5'6" tall, with shoulder length brown hair and a moustache. She told the police he was wearing a tan suede jacket, blue jeans and blue and white tennis shoes. Tulenchik, who knew James Roehl's brothers, Chris and Bob Roehl, from seeing them around town, told the officers she thought the intruder was Chris Roehl. She had never met James Roehl.

The investigating officers went to Chris Roehl's house. He answered the door wearing blue jeans, hiking boots and no shirt. He allowed them into the house, and one officer saw a tan jacket in the kitchen which matched Tulenchik's description of what the intruder had worn. Chris Roehl told them the jacket belonged to his brother James and went to get him.

James Roehl appeared, shirtless, wearing blue jeans and blue and white tennis shoes. He admitted wearing the tan suede jacket that night. The officers asked Roehl to come with them for questioning and, on the way to the station, took him by the Body Shop for identification. Tulenchik, who was waiting there, immediately confirmed that Roehl was the man she had seen in the building approximately 20 minutes earlier. The officers took Roehl directly to the police station after the identification. At the station Roehl stated he had been home all evening and denied being near the Body Shop. The police returned Roehl to his home and kept his tan suede jacket for evidence.

Later that night police took a formal statement from Chris Tulenchik. Although she had previously identified Roehl at the Body Shop, Tulenchik told the officers she believed there were two men in the building that night, not just one. She said both had similar builds and features, but one had on "a short sleeved blue shirt with colors and no jacket." The other wore a brown coat. She said she thought one of the men might have been Bob Roehl. However, the officers' investigation revealed that Bob Roehl had been in Brainerd at the time of the incident.

The next day, April 11, 1986, Tulenchik went to the police station for a photographic identification. She studied six photos of caucasian males, approximately the same age, all with moustaches and longer hair. She picked out James Roehl's picture as the man she saw in the Body Shop the previous night. The photographic display was not preserved and was not used as evidence of identification at trial. How-

ever, Roehl challenged the photo lineup at an omnibus hearing and the court upheld it as constitutional.

On April 16, 1986, the police called James Roehl to the station for questioning. He initially denied any involvement in the incident but, when confronted with Tulenchik's description of his jacket and the fact she positively identified him in the showup, he stated, "I did it."

At trial Roehl admitted he confessed to the investigating officers but explained the confession was "a wisecrack." The jury convicted Roehl of third-degree burglary.

The trial court denied Roehl's post-trial motions and he appeals, claiming the evidence was insufficient to support the verdict.

## ISSUE

Was the evidence sufficient to support appellant's conviction?

## ANALYSIS

The crime of burglary in the third degree is defined as follows:

> Whoever enters a building without consent and with intent to steal or commit any felony or gross misdemeanor commits burglary in the third degree * * *.

Minn.Stat. § 609.582, subd. 3 (1986).

Roehl's insufficiency claim rests on two grounds. First, he argues Tulenchik's identification was extremely suspect because she only saw the intruder's reflection for a brief moment and later told the police she was "positive" there were two men in the building the night of the incident. Second, Roehl claims that, even if he did break into the building, there was insufficient evidence of any intent to steal.

### A. *Identification*

■ An identification need not be positive and certain to support a conviction; it is sufficient if a witness testifies that, in her belief, opinion and judgment, the defendant is the person she saw commit the crime. *State v. Daniels*, 361 N.W.2d 819, 827 (Minn.1985). Although she stated there were two men in the building, Tulen-

chik gave a detailed description of the intruder's appearance—a brown-haired man with a moustache wearing a tan jacket with vertical lines, blue jeans and blue and white tennis shoes. James Roehl fit her description exactly.

■ Tulenchik's identification is strongly supported by the fact she positively identified James Roehl 20 minutes after the incident. One-person show-ups are a permissible means of identification if there is no "very substantial likelihood of irreparable misidentification." *State v. Griffin*, 336 N.W.2d 519, 524 (Minn.1983) (citing *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977)).

The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Tulenchik saw the intruder in the mirror and again as he ran out of the building. She apparently recognized a family resemblance in identifying the person first as Chris Roehl and later as Bob Roehl; she had never met James Roehl. Her description fit James Roehl and she identified him at a show-up 20 minutes after the break-in. Under the *Biggers* analysis, there is not a substantial likelihood of misidentification.

### B. *Intent*

■ The state must prove a defendant intended to commit some independent crime other than trespass after illegal entry into the building in order for a burglary conviction to stand. *State v. Larson*, 358 N.W.2d 668, 670 (Minn.1984). This intent may be proved from circumstantial evidence. *State v. Hardimon*, 310 N.W.2d 564, 566 (Minn.1981); *see Larson* at 670 (jury permitted to infer intent to commit crime).

■ A conviction based on circumstantial evidence may be upheld if the reason-

able inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt. *State v. Threinen,* 328 N.W.2d 154, 156 (Minn.1983). The jury is in the best position to evaluate the circumstantial evidence and the jury verdict must be given due deference. *State v. Anderson,* 379 N.W.2d 70, 75 (Minn.1985), *cert. denied,* 475 U.S. ——, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986).

There is sufficient circumstantial evidence to support the jury's finding of intent. The locked door had been forced open at night after business hours. Roehl fled after being found inside the building near the vending machines inside the front door. Viewing the evidence in the light most favorable to the prosecution and assuming the jury believed the state's witnesses and disbelieved the contrary evidence, *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981), we believe the evidence reasonably supports the jury's inference that Roehl intended to steal once inside the building.

### DECISION

Affirmed.